THE STATE, FREDERICK G. AGENS, CHARLES G. CAMPBELL, AND WILLIAM A. RANDALL, PROSECUTORS, v. THE MAYOR AND COMMON COUNCIL OF THE CITY OF NEWARK.

1. Special acts of the legislature, under which exemption from taxation is claimed on the ground of a contract, how to be construed.
2. The constitutional restriction that private property shall not be taken for public use without compensation being first made, does not apply to the power of taxation.
3. Assessments for local improvements are a legitimate exercise of the taxing power.
4. An excess of *six cents* upon an assessment of $24,948.81, will not avoid the assessment. It was clearly an unintentional error. The cases on this subject reviewed.

On *certiorari* to bring up an assessment for re-paving, with Nicholson pavement, that section of Broad street, in the city of Newark, lying between Market street and the Morris canal.

The facts of the case and the reason assigned for setting aside the assessment, are distinctly set forth in the opinion of the court.

The argument was had in February Term, 1871, before Justices WOODHULL, DEPUE, and VAN SYCKEL.

For plaintiffs, *McCarter & Keen.*

For defendants, *N. Perry, Jr.*

The opinion of the court was delivered by

WOODHULL, J. This writ of *certiorari* brings up an assessment for re-paving, with Nicholson pavement, that section of Broad street, in the city of Newark, between Market street and the Morris canal.

From the statement of facts on which this case was argued, it appears that in the year 1852, Broad street was paved

under the authority of the common council of said city, in pursuance of the city charter, and the several supplements thereto then in force, the said street, excepting the sidewalks, having never before been paved.  In the following year, an assessment was made upon the owners of lots situate on the said section of Broad street, in proportion to the number of feet front owned by them respectively, and the amounts so assessed were afterwards duly paid to the said city.

Some of these same lots are now owned by the prosecutors, and the present assessment is made upon them as such owners.

This assessment was made under the provisions of an act approved March 18th, 1868, the first section of which provides " that when more than one-half of the owners of the frontage on the line of any street, or section thereof, which is now paved, shall apply to have such street or section re-paved, it may be lawful for the common council to order and cause the re-paving thereof, and they shall assess upon the owners of the lots fronting upon the line of such streets or sections thereof, two-thirds of the costs and expenses of such *re paving*, and the city treasurer shall bear the remaining one-third," &c. *Acts of* 1868, *p.* 411.

This first section of the act of 1868, the prosecutors insist is, as to them, unconstitutional and void :  1. Because it impairs the obligation of a contract.  2. Because it authorizes the taking of private property for public use, without just compensation.

The contract which is supposed to be violated by the act of 1868, the prosecutors find in the act which was approved February 28th, 1849, and under which Broad street was paved in 1852.

The seventh section of that act provides " that it shall be lawful for the common council, on the application of three-fourths of the owners of property in any street, to order the said street or section of the street to be graded, graveled, paved, flagged, or planked, either in whole or in part, in such manner as they shall deem most advisable," &c. ; and that, after the said grading, graveling, paving, &c., is once effected,

then the city shall take charge of and keep the same in repair, without further assessment. *Acts of* 1849, *pp.* 206, 207.

The prosecutors contend that these provisions amount to an offer or promise by the state, to the persons who at that time owned lots on the line of Broad street, that if they would apply for and procure the paving of said street, in accordance with such provisions, and would duly pay the assessment authorized by the act of 1849, the lots then assessed should be exempt from all further assessments of the same kind, whether for paving, re-paving, or repairing.

This offer or promise having, as the prosecutors insist, been accepted, and acted upon, and considerable sums of money having been expended on the faith of it, by those who then owned the lots in question, cannot now be withdrawn or receded from by the state, but must be held to have the effect of a contract which neither the constitution of the United States nor of this state will suffer to be violated.

The question arising on this part of the case is simply one of fact, depending on the true construction of the seventh section of the act of 1849, viz. :   Does that section contain any such offer, or promise, or proposition, as the prosecutors allege, and on which they found their claim to be exempt from this assessment?

Notwithstanding the very ingenious argument submitted to us by the counsel of the prosecutors, we are constrained to answer this question in the negative.

" It shall be lawful for the common council "—such is the language of the section referred to—" on the application of three-fourths of the owners of property in any street to order," &c.   There is certainly nothing in this language to indicate, even remotely, that the legislature intended to propose or offer anything to the property owners.   It simply confers upon the city, authority to order streets to be graded, &c., and prescribes the condition upon which alone that authority could be exercised.   Nor can the last clause of the section, namely, " that after the said grading, &c., is once effected, then the city shall take charge of and keep the same in repair,

without further assessment," be fairly understood to be a promise to the property owners that the city would take charge, &c. It was intended merely to restrain and limit the authority previously conferred, not by way of contract, but as a matter of municipal regulation, in which the state and the city of Newark were alone concerned.

Applying to the provisions of this section a much less rigid rule of construction than that which the courts have uniformly felt bound to adopt, in cases involving questions of exemption from taxation, they would seem to impart nothing more than an authority to order the streets to be graded and paved, and a legislative restriction of that authority, amounting simply to this: that, until further authorized, the city should not require those who had been once assessed for paving a street, to be further assessed for keeping the same in repair.

This conclusion renders it unnecessary to consider another question much discussed in the argument, namely, whether, if the act of 1849 should be held to contain a contract exempting the prosecutors from any further assessment for *repairing*, such exemption would include this assessment for *re-paving*.

The act of 1868, then, does not impair the obligation of any contract.

Does it authorize the taking of private property for public use, without just compensation, in the sense of the constitutional clause which prohibits such taking?

It seems to be perfectly well settled that the constitutional restriction here referred to does not apply at all to the power of taxation, and this great legislative power is in no sense limited by it. And it is equally well settled that assessments for local improvements are a legitimate exercise of the taxing power. *Sedg. on Stat. and Con. Law* 502, and cases cited.

Referring to the objection now under consideration, the learned author just cited, remarks as follows: "It has been urged that this mode of disposing of private property was a violation of the clause declaring that private property was not to be taken without just compensation, and that it disregarded

the proper principles of taxation. But all these objections have been overruled, and it has been decided in many of the states that, in the absence of any express constitutional provision upon the subject of taxation, the power to tax implies the power to apportion the taxation, and that the remedy against unwise and unjust modes of taxation lies with the legislature and with the people, and not with the judiciary." *Ib.* 502, 503. See also *Cooley's Con. Lim.* 497, 498, and cases.

It was objected to the assessment in this case, that it does not appear to have been made with reference to benefits; that an assessment for benefits must be just and equitable, and not arbitrary; and that the only just and equitable assessment is one in proportion to benefits, and limited to benefits.. In support of these objections, and for the purpose of showing that the assessment in question must have been an exercise of the power of eminent domain, and not of the taxing power, the case of *The Tidewater Co.* v. *Costar*, 3 *Vroom* 519, was cited.

Similar objections, supported by the same citation and the same line of argument, appear to have been taken in the case of the *State, Sigler, pros.,* v. *Fuller, Collector*, decided in June Term, 1870, (5 *Vroom* 227.) The assessments in that case were of one-sixth of the cost of constructing sidewalks in front of other lands opposite to the prosecutor's, as authorized by an act approved April 1st, 1869, (*Pamph. L., p.* 1206,) and it was urged against their validity that the owner opposite could not be assessed beyond the benefit received, and that the fixing of an arbitrary rate might lead to that result. The assessments were, nevertheless, sustained, and were held not to be within the principle of the *Tidewater Co.* v. *Costar*. Mr. Justice Bedle, delivering the opinion of the court, says: "It must, therefore, be taken as a principle that the legislature can provide for the whole cost of such local improvements as the one before us, to be assessed upon lands peculiarly benefited. It is the imposition of a tax for a mere local improvement. The mode of its apportionment and the extent of territory that may be embraced within it are neces-

sarily matters of legislative discretion. These are the neces-
sary incidents of the exercise of the power. That same power
can determine that the scope of the assessment shall be
limited to a smaller district, or a particular class of owners
peculiarly situated and benefited with reference to the im-
provements. And so, also, the mode of apportionment may
be fixed, whether according to valuation or frontage, but
whether one mode or the other is preferable is a matter of
discretion with the legislature, with which the courts should
not interfere, unless it can be clearly seen that the provisions
of the constitution are disregarded." *Opinion, p.* 10, and
cases.

On the whole we are satisfied that the assessment in this
case ought not to be set aside as unconstitutional and void, on
either of the grounds alleged by the prosecutors. The appli-
cation or petition to the common council is admitted to
have been signed by twenty-four owners, representing more
than one-half of the entire frontage, and more than one-half
of the whole number of lots, but being, in fact, less than one-
half of the whole number of persons interested in the said
lots as owners. It is, therefore, further objected to the valid-
ity of the assessment in this case, that the re-paving was not
applied for by more than one-half of the owners of the front-
age, as required by the act.

To this objection the counsel for the city reply—

1. That the words " more than one-half of the owners of
the frontage," should be understood as if they had been " the
owners of more than one-half of the frontage."

It will be observed that while this construction does not
require a single word to be added, or omitted, or substituted,
it does require an arrangement of the words differing widely
from that adopted by the legislature, and yielding, mani-
festly, a different sense. This, we think, is not admissible.
In the absence of anything indicating clearly a different
legislative intent, the words are to be taken in their plain
and natural sense, as they stand related to each other in the
act. Interpreted by this rule, the clause in question must be

understood to mean that to authorize an order to re-pave there must be an application by more than one-half of the owners, numerically, and not merely by owners representing more than one-half of the frontage. We might, with as much propriety, give to the clause in question a different meaning, by striking out, or adding, or substituting a word, as by the transposition just referred to.

2. The second answer given by the counsel for the city to the objection now under consideration is, that several persons having a joint or common interest in the same lot are to be taken as constituting together only one owner; and that the twenty-four petitioners are in fact, in the sense of the act, more than one-half of the owners of the frontage.

This we understand to be the true construction of the clause in question. The improvement contemplated by the act was not intended to be controlled by the force of numbers alone, nor alone by the extent of frontage owned, but by these two elements combined in such proportion as seemed most likely to secure, practically, to each its proper influence. The legislature intended to avoid, on the one hand, the extreme of permitting an indefinite number of persons, having a joint or common interest in a single lot, to control the action of perhaps all the owners of all the remaining lots; and on the other hand, of allowing one man, who might happen to be the owner of more than one-half of the entire frontage of a street, at his pleasure to introduce or hinder a public improvement against the wishes of all other lot-owners upon the same street. In attempting to ascertain the precise meaning of the words owners, *owners of the frontage*, it should be remembered that the frontage here referred to was that of a street already improved, so that the attention of the legislature may fairly be presumed to have been fixed upon the frontage, not as a single, unbroken line, but as it was, in fact, made up of distinct and definite parts, each measuring the frontage of a lot actually existing, and located on the line of the street.

" The owners of the frontage," then, would naturally mean

not the owners of indefinitely small fractions of the entire frontage, nor of undivided fractional parts of a lot frontage, but the owners, respectively, of the several lots fronting along the line of the street.

A subsequent clause of the same section directs that two-thirds of the costs and expenses of the re-paving shall be assessed upon "the owners of the *lots fronting* upon the line," &c.

The *owners* liable to be assessed under the second clause are manifestly the same *owners* who, under the first clause, may apply to the common council.

And as the ownership of a lot fronting on the line was intended to make the owner or owners liable to be assessed for such lot—no more than a single assessment being contemplated for a single lot—so, under the first clause, the ownership of a lot frontage was intended to confer the right to apply to the common council; each lot frontage, whether owned by one or many, being regarded as having but one *owner* for the purpose of the application.

It was further objected on the part of the prosecutors that the ordinance under which this assessment was made was not in pursuance of, nor authorized by, the petition—that being for the re-paving of Broad street, while the ordinance provides for the re-paving of one section only of Broad street.

The petition reads as follows : " We, the undersigned, owners of property on Broad street, between the Morris Canal and Market street, respectfully petition your honorable body to have said street re-paved with Nicolson pavement."

While it must be admitted that this petition will bear the construction given to it by the counsel of the prosecutors, we think it will as well admit of the construction which appears to have been adopted and acted upon, both by the petitioners and the common council.

The words "said street," in the last line but one of the petition, may be fairly understood to mean *Broad street*—not in its whole extent, but as limited by the words immediately following it, namely, " between the Morris Canal and Market street."

The only remaining objection to be considered is that the assessment upon the owners of the lots was for a greater proportion of the costs and expenses of the improvement than the law permits.

The costs and expenses amounted to $37,423.22, of which two thirds only, amounting to $24,958.81, omitting decimals, could lawfully be assessed upon the lot-owners.

The sum actually assessed upon them was $24,948.87—just six cents more than the two-thirds authorized by the act.

On the part of the city, it is contended that this excess is too trifling to be regarded; and that the objection founded upon it is sufficiently answered by the maxim "*de minimis non curat lex.*" How far this maxim may properly be applied to proceedings of this character, does not appear to be definitely settled. In the case of *Huse* v. *Merriam,* 2 *Greenl.* 375, where the excess was eighty-seven cents in a tax of $226.62, and the proceedings were, on that account, held to be void, Mellen, C. J., delivering the opinion of the court, says: "It is contended that the sum of eighty-seven cents is such a trifle as to fall within the range of the maxim *de minimis,* &c.; but if not, that still this small excess does not vitiate the assessment. The maxim is so vague in itself as to form a very unsafe ground of proceeding or judging."

In *Case* v. *Dean et al.,* the Supreme Court of Michigan held that an excess, whereby each dollar of legal tax was perceptibly increased, could not be considered unimportant, and expressed the opinion that the maxim *de minimis,* &c., should be applied with great caution to such proceedings. 16 *Mich.* 12.

Referring to these and other kindred cases, in connection with that of *Kelly* v. *Corson,* 8 *Wis.* 182, where an unintentional excess of $8.61 in a tax of $6,654.56, was held not to be fatal, Judge Cooley cautiously remarks: "Perhaps, however, a slight excess, not the result of intention, but of erroneous calculation, may be overlooked in view of the great difficulty in making all such calculations mathematically correct, and the consequent impolicy of requiring entire freedom from all errors." *Cooley's Con. Lim.* 520, 521, and notes.

The error in this case was clearly unintentional. It may have resulted from mistaking the figure one for a seven, or from a slip in the calculation, or from some other accidental cause equally trivial. But however this may have been, it is certain that the excess is so slight, that when distributed among the forty-odd lot owners, it cannot possibly affect any one of them to the extent of the smallest coin known to our currency.

Unless the maxim *de minimis*, &c., has no proper application to proceedings relating to taxation, or assessments for local improvements—and we are not aware that the decision in any one case has gone as far as that—an error so insignificant and harmless as this cannot reasonably be excluded from its operation.

Admitting all that has been said in the cases above referred to, with regard to the vagueness of the maxim and the caution to be exercised in applying it, we are satisfied that the excess in this case is fairly within its range, and that the objection to the assessment founded on such excess, ought not to prevail.

For the reasons above stated, we are of the opinion that none of the objections to the validity of the assessment in this case are well founded, and that the assessment should, therefore, be affirmed.

*Assessment affirmed.*

REVERSED 8 *Vr.* 415.